```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION


Erik Esparza,                      )
                                   )
            Plaintiff,             )
                                   )
                                   )
                                   )
                                   )
      v.                           )  No. 16 C 6016
                                   )
Nick Wolf                          )
                                   )
            Defendant.             )
```

Memorandum Opinion and Order

Plaintiff Erik Esparza was arrested on July 11, 2015, after Deputy Nick Wolf of the Kane County Sheriff's Department and his canine partner Tyront discovered him behind a garage in an alley of a residential neighborhood in Aurora, Illinois. Esparza claims that Wolf violated his Fourth Amendment rights by using excessive force to effectuate his arrest, and he seeks damages pursuant to 42 U.S.C. § 1983. Before me is Wolf's motion for summary judgment, which I grant for the reasons that follow.

I.

On the evening of July 11, 2015, Deputy Wolf responded to a call to assist the Aurora Police Department in investigating an officer-involved shooting. Upon his arrival at the scene, Wolf learned that two suspects were at large, and that Officer Spooner

of the Aurora Police Department was tracking them with the assistance of his canine partner, Rex. Because the suspects were potentially armed, Spooner asked Wolf to provide "lethal cover" while he and Rex continued to track. Spooner Dep., Def.'s L.R. 56.1 Stmt. Exh. 3 at 40-41.

Deputy Wolf recounts the following series of events. After the officers had been searching for some time, the Aurora Police Department instructed them to proceed to a residential address where one suspect had reportedly been seen. At that location, the officers switched roles, with Wolf and Tyront tracking the suspects and Spooner providing backup cover. It was dark at the time, and Wolf used his flashlight "periodically" during the search. Wolf Dep., Def.'s L.R. 56.1 Stmt., Exh. 1 at 44. Wolf recalls giving his "standard" announcement at the driveway of the house, which is to say that he identified himself as a canine officer; said that the suspect was under arrest and must come out with his hands up; and said that a police dog would be used to search and may bite the suspect when found. *Id*. at 42. Wolf then proceeded with Tyront up the driveway, through a back yard, and into an alleyway surrounded by several garages.

Wolf testified that he stopped at the front of a garage near an "area with overgrown brush and debris." *Id*. at 45. There, Wolf made a second announcement and heard a human sound emanating from between two garages. Wolf shone his flashlight into the area but

2

was unable to see who or what was there. Believing the suspect was nearby, and having gotten no response to his announcements or orders to surrender, Wolf released Tyront (who at that point was lying on the ground, awaiting his next instruction) to continue searching. *See id*. at 46-48, 50-51. After Tyront located Esparza hiding in the bushes, he bit and held Esparza's right forearm. Aurora Police Officer Patrick Camardo assisted Wolf in placing Esparza in handcuffs. Tyront then immediately released his hold on Esparza's arm pursuant to Wolf's command. *Id*. at 52-54, 82.

Esparza recounts a very different version of these events. To begin, he disputes having a firearm with him on the evening in question. According to his account of the evening, Esparza and some friends were waiting around the neighborhood in hopes of meeting up with some women they had spoken to via social media when Esparza saw two men he did not recognize (but who he later learned were police officers) pointing guns at him from inside a vehicle. Esparza Dep., Def.'s L.R. 56.1 Stmt., Exh. 6 at 13-16. Fearing for his life, Esparza ran away, with the car in pursuit. When he could no longer run, Esparza stopped at a house, where the unknown assailants shot at him through the windshield of the vehicle. *Id*. at 20. Esparza continued to run through streets and backyards for an hour to an hour and a half, during which time he did not see any police cars or officers and did not hear any sirens. *Id*. at 21-23. At some point, he hid between two garages in

an alleyway behind a house, where there were "electricity posts and some bushes or high grass." *Id*. at 28. When he determined that the coast was clear, he emerged from his hiding spot and saw a female resident of the house. He raised his hands and told her he was no harm to her, and the woman then went inside the house. Esparza then "thought about it" and decided he "wasn't a hundred percent sure [he] was safe," so he returned to the back of the garage. *Id*. at 25-28. According to Esparza, it was still light out at this time. *Id*. At 27.

From the back of the garage, Esparza saw police officers with their guns out and a canine in the driveway. As the officers approached, Esparza lay down on his stomach in the grass behind one of the garages "in order for them not to see [him] as a threat." *Id*. at 31. No one told Esparza to come out, and Esparza said nothing to the officers, explaining that he "didn't want to be a surprise." *Id*. Esparza then heard one of the officers give a command to the dog, which attacked him, biting him multiple times on the biceps and forearm. *Id*. at 33. According to Esparza, the dog continued to bite him despite the handler's command to release and throughout the time the officers placed him in handcuffs. *Id*. at 34-35. Esparza testified that the officers did not tell him why he was under arrest, nor did he ask, explaining: "I figured I'll find out eventually." *Id*. at 36.

A handgun was later recovered in the "flight path" where Esparza had been seen running. Spooner Dep., Def.'s L.R. 56.1 Stmt., Exh. 3 at 71. Esparza was charged with unlawful possession of a firearm by a street-gang member, aggravated unlawful use of a weapon, and aggravated assault. He was convicted of these offenses after a jury trial, and the conviction was upheld on appeal. *See* Def.'s L.R. 56.1 Stmt., Exh. 5, 7.

## II.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But "[t]he mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Dawson v. Brown,* 803 F.3d 829, 833 (quoting *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004) (alteration and emphasis in *Lawrence*)). A factual dispute is both genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 474 U.S. 242, 248 (1986).

Esparza's amended complaint claims that Wolf's deployment of Tyront to effectuate his arrest constituted excessive force in violation of the Fourth Amendment.[1] Wolf raises two arguments in

---

[1] On its face, the amended complaint asserts a violation of the Eighth Amendment, but the parties agree that Esparza intended to assert rights guaranteed by the Fourth Amendment.

5

his motion for summary judgment. First, he contends that the undisputed factual record shows that his use of force was objectively reasonable as a matter of law. Second, he argues that even if Esparza's constitutional rights were violated, Wolf is protected from liability under the doctrine of qualified immunity.

"An officer's use of force is analyzed under the Fourth Amendment's objective reasonableness standard, and 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Alicea v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In assessing whether Wolf's use of Tyront to find and seize Esparza was objectively reasonable, I consider the totality of the circumstances, including: 1) the severity of the crime at issue; 2) whether Esparza posed an immediate threat to the safety of the officers or others; and 3) whether Esparza was actively resisting arrest or attempting to evade arrest by fleeing. *Johnson v. Scott,* 576 F.3d 658, 660 (7th Cir. 2009)(citing *Graham*, 490 U.S. at 396).

On the undisputed evidence, the first factor plainly favors Wolf. There is no dispute that Wolf's involvement in Esparza's apprehension was triggered by the Aurora Police Department's call for assistance in locating suspects involved in a shooting. As for the second and third factors, while Esparza purports to dispute that he was actually armed on the night in question and had stopped

6

either fleeing or hiding by the time the officers discovered him (more on these disputes shortly), the complaint itself acknowledges that the information Wolf received from other law enforcement officers led him "to reasonably believe that [Esparza] had resisted arrest, was armed and dangerous, and had fled the scene of his arrest." Am. Cmplt. at ¶ 15. In addition, Wolf testified that other officers had told him that Esparza "had been running from the police" and "that it was possible that he was armed with a firearm." Wolf Dep., Def.'s L.R. 56.1 Stmt., Exh. 1 at 120-121. Esparza's own account of the evening confirms that he intermittently ran and hid for at least an hour while police officers combed the neighborhood for him. That Esparza claims to have learned only later that it was law enforcement—not armed civilians—in pursuit of him is of no moment from Wolf's perspective, which is the viewpoint that matters. *See Alicea*, 815 F.3d at 288.

Esparza argues that a factual dispute over whether he "surrendered" before Wolf commanded Tyront to search the area behind the garage precludes summary judgment. But there is no evidence that Esparza surrendered to the officers. Esparza testified that he lay down in the grass behind the garage so that the officers would not see him as a threat, and that he remained silent so that he would not surprise them. But these benign motives would not have been apparent to Wolf. In fact, there is no evidence

7

that Wolf even saw Esparza in the "spread eagle" posture Esparza claims he adopted. Accordingly, even if a jury credited Esparza's testimony, it proves, at most, Esparza's subjective intent. Meanwhile, the objective circumstances observable by Wolf would not have led a reasonable officer to believe that Esparza had surrendered. From Wolf's vantage point, a potentially armed suspect who had fled from police remained concealed somewhere in a residential neighborhood, despite obvious police presence nearby. "Police are entitled to err on the side of caution when faced with an uncertain or threatening situation," *Johnson*, 576 F.3d at 659, and Wolf reasonably interpreted Esparza's failure to make his presence known as potentially dangerous.

Relatedly, Esparza argues that a factual dispute over his "visibility" to the officers prior to his arrest requires a trial. It is true that Esparza insists that it was still daylight at the time of his arrest, while each of Wolf, Spooner, and Camardo testified that they used flashlights during the search because it was dark out.[2] Additionally, Esparza testified that he was "no longer hiding" and he lay in ankle-length grass as the officers approached, while Wolf testified that Tyront discovered Esparza hidden in the overgrown passageway between two garages. These disputes are immaterial, however, because whatever the lighting

---

[2] Camardo Dep., Def.'s L.R. 56.1 Stmt., Exh. 2 at 30-32, 86; Spooner Dep., Def.'s L.R. 56.1 Stmt., Exh. 3 at 50-51.

conditions or exact location where Esparza was found, the record as a whole does not reasonably suggest that the officers actually saw him at any point before Tyront apprehended him. To the contrary, Wolf testified that he could *not* see Esparza when he peered down the alley, and Esparza's own testimony implicitly confirms that he was, in fact, hidden from the officers' view. Otherwise, his concern about "surprising" them by speaking would make no sense. Although reasonable inferences must be drawn in Esparza's favor, "favor toward the nonmoving party does not extend to drawing inferences that are supported only by speculation or conjecture." *Dawson*, 803 F.3d at 833 (citation omitted). Even if a jury believed Esparza's characterization of his surroundings, any inference that Wolf actually saw Esparza to perceive his unthreatening posture is not only speculative but at odds with the affirmative evidence.

Esparza also argues that summary judgment is inappropriate based on a factual dispute over whether he was armed at the time the officers were searching for him. This argument suffers from multiple flaws, not least of which is that a jury later tried and convicted Esparza of offenses requiring proof that Esparza actually possessed a firearm on the evening in question. While later-discovered proof that Esparza was in fact armed does not, of course, establish the reasonableness of Wolf's belief that he was armed, it confirms the information that all agree Wolf received at

the time he was dispatched: that Esparza had fled following a shooting and was believed to be armed and dangerous. Esparza identifies no evidence to suggest that Wolf should have known Esparza discarded his weapon prior to hiding in the alley. On this record, no reasonable jury could render a verdict in Esparza's favor on the ground that Wolf unreasonably believed Esparza to be armed when he commanded Tyront to search for him.

Nor could a jury reasonably conclude that Wolf violated Esparza's Fourth Amendment rights by failing to call Tyront off immediately after Esparza was subdued. Although Esparza testified that Tyront continued to bite him as the officers placed him in handcuffs and kept biting him after Wolf ordered him to release, there is no evidence that Wolf waited longer than necessary to free Esparza from the dog's grip. Esparza testified that Wolf "physically...put his hand under his front paws and lifted him off," Esparza Dep., Def.'s L.R. 56.1 Stmt., Exh. 6 at 34-35. According to Officer Camardo, it took Wolf only "a second or two" to do so. Camardo Dep., Def.'s L.R. 56.1 Stmt., Exh. 2 at 38. Even crediting Esparza's testimony that Tyront failed to release his bite immediately—a fact Wolf categorically disputes—the only reasonable interpretation of the evidence is that Wolf intervened appropriately and quickly freed Esparza from Tyront's grip.

The only factual issue that raises a close question on summary judgment is whether Wolf adequately warned Esparza of his intention

10

to mobilize Tyront to search and apprehend him. As noted above, Wolf testified that he made several announcements to notify Esparza that a canine search was underway and alerting him to the possibility that the dog would find and bite him. That testimony was corroborated by Officer Spooner, who testified that he heard loud, precise police commands given in English. Spooner Dep., Def.'s L.R. 56.1 Stmt., Exh. 3, at 46. But Esparza insists that Wolf made no announcement and gave no warning before releasing Tyront. In Esparza's view, this dispute requires a trial because if Wolf failed to give a warning, then his use of force was objectively unreasonable as a matter of law.

Esparza is correct that police must, as a general matter, warn suspects before engaging a biting police dog. *See McGovern v. Village of Oak Lawn*, No. 01 C 3772, 2003 WL 139506, at *7 (N.D. Ill. Jan. 17, 2003). In *McGovern*, the court examined the totality of the circumstances standard and concluded that summary judgment of the plaintiff's excessive force claim was inappropriate. The plaintiff, who had fled on foot following a traffic stop, argued that officers unreasonably used a police dog to seize and forcibly remove him from a confined hiding space, notwithstanding his offer to surrender. *Id*. While the parties disputed whether the officers issued a warning before mobilizing the dog, they agreed that the plaintiff offered to surrender before the dog was commanded to seize him. The dog bit and held the plaintiff's right arm, then

11

dragged him out from his hiding place, bloodying his knees. After the officers "eventually" removed the dog from the plaintiff's right arm, it bit him again in the left arm.

The court declined to hold that the officers' use of the dog was reasonable as a matter of law. The court focused on the third *Graham* factor, i.e., whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," and emphasized that the plaintiff offered to surrender and attempted to comply with the officers' orders before being dragged out of hiding by the dog. In addition, the court noted that the plaintiff's "hiding spot allowed neither a means of escape from the authorities nor an opportunity to ambush the officers." *Id*. On these facts, the court stated that it was "unwilling to grant summary judgment" on the issue of reasonableness. The court found "further support" for its conclusion in the Seventh Circuit's unpublished decision in *Bey v. Cimarossa*, 202 F.3d 272 (Table), 2000 WL 12830, at *2 (7th Cir. 2000), where the court held that whether officers provided a warning before using a police dog was "material" to the excessive force analysis. The *Bey* court, in turn, cited a Fourth Circuit case holding that the "failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force

12

context." *Bey* at *2 (quoting *Vathekan v. Prince Georges County*, 154 F.3d 173, 179 (4th Cir. 1998))[3].

These cases confirm that whether an officer warns a suspect before using a police dog is a factor courts must consider in assessing whether the use of force was reasonable under the circumstances. But none establishes the bright-line rule Esparza suggests, which would require a trial any time an arrestee denies hearing a warning before being bitten by a police dog. To the contrary, the facts of these cases underscore the importance of context to the reasonableness analysis. In *Vathekan*, for example, a police dog mauled and disfigured a sleeping woman who was not suspected of any crime after its handler commanded it to search her first-floor residence in response to a suspected burglary reported in the basement apartment. Although several officers testified that the handler gave a "very loud" warning before releasing the dog into the plaintiff's house, the plaintiff and another witness swore that they heard no announcement before the dog was allowed through a closed interior door that separated the two residences. After entering the plaintiff's residence, the dog:

> bounded to the bed where Vathekan slept and bit into the left side of her skull. She struggled in vain to escape as the dog shook her violently. Suddenly, the dog let go of Vathekan's skull and then clamped its jaws firmly onto the right side of her face. Vathekan was now wide awake and fully conscious of the cracking sound of the

---

[3] The *Bey* court mistakenly refers to *Vathekan* as a Sixth Circuit case.

13

> bones in her face being crushed under the dog's vise-like grip.

154 F.3d at 177. On these facts, the Fourth Circuit reversed the lower court's decision granting summary judgment in favor of the canine handler on the ground of qualified immunity. The court noted the factual dispute over whether the handler warned the plaintiff before allowing the dog into her residence and explained that "summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendant." *Id*. at 180 (citation omitted).

The *Vathekan* court's holding does not stand for the sweeping *per se* rule Esparza suggests, nor does it compel a trial on the facts here. Among other obvious distinctions between *Vathekan* and this case, Esparza admits that he saw canine officers and a police dog approaching the alley where he lay behind a garage. Regardless of how a jury would resolve the dispute over whether Wolf made his "standard" canine announcements, plaintiff undisputedly saw the officers before they saw him and could have avoided the necessity of a canine search by making his presence known to them. Instead, he remained quietly out of the officers' sight while the search proceeded. In the particular circumstances of this case, and unlike in *Vathekan* or *McGovern*, the objective reasonableness of Wolf's use of Tyront does not turn on the adequacy of his prior announcements.

III.

Because I conclude for the foregoing reasons that Wolf's deployment of Tyront was objectively reasonable under the totality of the circumstances, I need not reach Wolf's argument that he is entitled to qualified immunity. The motion for summary judgment is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 22, 2019